LILLIAN COLEMAN, by next friend, respondent,

*v.*

WILLIAM GRAFF et al., appellants.

[Decided September 22d, 1922.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Buchanan, who filed the following opinion:

(Orally, after argument.)

"The bill is filed by the holder of a judgment of record in the supreme court, which judgment remains unsatisfied, against the defendant William Graff, who was formerly the record title holder of premises known as 705 Chestnut avenue, in the city of Trenton, and the defendant Mrs. Jurich, to whom Graff conveyed the property in question, and Mrs. Jurich's husband, as the holder of the possible interest by the curtesy.

"The proofs are entirely convincing to my mind that the conveyance of the property by Graff to his mother was made after there had been a conversation between Graff and the

complainants, and others representing her, as to Graff's liability· upon his promise of marriage to the complainant. The complainant's testimony is to the effect that on the 31st day of August, 1920, there was a conversation in the office of Mr. Kraemer, by Mr. Kraemer, Miss Coleman and her mother, on the one side, and Graff on the other, in which Graff was asked as to his promise of marriage and as to his intention of fulfilling it. He said he would not fulfill it— he would not marry her. There is a conflict in the testimony of the three witnesses of the complainant and Graff upon certain points, but taking it at its weakest for the complainant, it is perfectly obvious that at that conversation the subject was brought up, and there was sufficient at any rate that took place to make Graff, or any other reasonable man, understand that the complainant intended to take legal action against him if he did not marry her. What other explanation could there be, for instance, for the conference having been had in the lawyer's office? There is no serious attempt to deny it. And the denial of Graff went simply to this extent: he denied that at that conference he admitted he had promised to marry the complainant. He did not deny on the witness-stand that he had promised to marry her; he did not deny that at that conference he had said he had given her the diamond ring or that he had seduced her; he did not deny that at that conference he had said he was not going to marry her. There was some slight attempt in the defendant's testimony to deny that this conference took place on August 31st. I am satisfied, however, that it took place either on August 31st or September 1st, that it took place prior to the conveyance. The weight of the evidence is, of course, that it took place on August 31st.

"Now, with those facts established, and the fact that the conveyance was thereafter made, on September 2d, and that no consideration—that is, no then presently moving consideration in the shape of material consideration—was paid for the conveyance to the mother, a case is established which throws upon the defendants the burden of proof.

"The judgment in the supreme court is, of course, *res adjudicata* that there was this liability, that there was this promise and breach of promise from which the liability arose, which was reduced in that suit to a judgment for damages, and therefore that that liability existed at the time the conveyance was made. Now, to avoid the conclusion that that deed of conveyance was made with intent to hinder, delay and defraud creditors, the defendants say the deed was made not with any such intent, but because of circumstances utterly irrespective of anything to do with the liability of the defendant Graff to Miss Coleman. They say that title to the property, when originally taken in Graff's name, was taken upon an understanding or agreement between himself and his mother that he would pay to her the cash which she paid for the property and also the moneys which she advanced for him upon that property; that she was the one who paid all the consideration for the purchase of the property; and that she had under that agreement a vendor's lien upon the property until the purchase price was paid; that in the middle of the summer of 1921 it was found that Graff would not be able to keep up his payments, and that therefore there should be a rescission of the agreement and conveyance of the property back to the mother, and the whole thing called off. Now, that is, in brief, the substance of the testimony from the standpoint of the defendants. If that were so, and if the consideration were adequate, then there could be no·setting aside of the conveyance in this suit.

"I confess that the case has given me a great deal of difficulty. To take the testimony and sift out the actual truth from the mass of testimony and evidence that has been offered has not been easy. It is, however, clear that as a matter of law the consideration for this property was not paid by the ·mother at the time of the purchase of 705 Chestnut avenue. The proofs show that as far back as 1914, I think it was, the mother (who was then a widow) and the son entered into an agreement for the purchase of a property upon· Emory avenue, and a deed of conveyance was made to them as tenants in common; that shortly after-

15

wards (being also soon after the marriage of the mother to Jurich) the Emory avenue property was sold and the proceeds used to purchase a property on Beatty street; that young Graff was a party to the contract of sale of the Emory avenue house and a party to the contract of purchase of the Beatty street property, and the deed to the Beatty street property was taken in their names as tenants in common. Thereafter that property was sold and a property similarly bought at 711 Chestnut avenue, and finally the property at 711 Chestnut avenue was sold and with the proceeds of sale of that property, which was some $2,975, as I recall it, in cash, two properties were purchased at 705 and 707 Chestnut avenue. The title, instead of being taken in the names of the two as tenants in common, was taken in the name of Graff alone as to 705, and in the name of Mrs. Jurich alone as to 707; as a matter of fact, the deed was made not to Mrs. Jurich herself, but to Antonio Marolda as trustee for Mrs. Jurich, a fact which I will comment on a little later.

"Now, it is said Graff never had any money in these properties. In the first place, I am by no means convinced of that. I think the proofs show that he did have some money, actually, in these properties. He was working and earning money from 1911 on, and from a time two or three months after he commenced work in 1911 he was earning somewhere around $8 or $9 a week. Now, the uncontradicted testimony is that he paid to his mother $5 a week board at or about that time, and some time later $10 a week board, and continued that on up to practically the present time. I think he testified that he was at the present time paying $10 a week board. At any rate, he was paying $10 a week board in 1916 and 1917, during all this time when other people in the same house were paying to his mother board at the rate of only $3.50 a week. Up until 1917 my recollection is that the testimony was that the boarders were paying $14 a month, and yet the son was paying $10 a week. That was not contradicted; so that the mother did have funds of his. Of course, the testimony is not clear nor complete as to the actual and complete financial relationship and dealings between the

mother and son, but I am satisfied that there were moneys earned by the son which went into that property.

"However, whether there were or not, he certainly had made himself liable on the contract of purchase,. and also on the assumption of the mortgage indebtedness. (I am not sure that he was quite of age at that time, but he never disaffirmed those obligations; on the contrary, he ratified them by participating in the subsequent sale and sharing in the proceeds). There is no slightest evidence of any agreement between himself and his mother' that she should save him harmless on these obligations, that as between the two the liability was to be wholly hers.

"And even disregarding all question of consideration by the son, and taking the testimony of defendants at its strongest, there is shown a completed gift of the undivided half interest. The mother says she put the first property in the names of the two as tenants in common in case she got married or anything happened to her. She did get married; so that if there was any condition attached, in her mind, to the gift, that condition was fulfilled. Furthermore, the proofs as to the acts and dealings of the mother and son together in the entire chain of title, shows that there was an ownership and dominion exercised by the son, to a greater or less extent · over each of the properties in succession. It was claimed that the husband, Jurich, had some interest in these properties; that he had put in work in making improvements on the properties, and that he was responsible for some of the enhanced value that was obtained. . That may have been so, but there was not the slightest testimony that there was any agreement between the parties that he was to have a lien on, or any interest in, the properties for what he had done. Neither was there any testimony that might indicate in any definite manner the amount of the value of the improvements he had put in.

"So that upon the testimony I am bound to conclude that the son was a purchaser and paid the consideration himself for this property at 705 Chestnut avenue. The entire purchase price of the two properties was $7,000, of which the

original agreement was that $3,000 should be paid in cash and the balance by a $2,000 mortgage upon each property. In fact, when the time came to conclude the matter, the vendors insisted upon having $4,000 in cash and taking only a $1,500 mortgage on each property. Now, as to 705 Chestnut avenue, Graff was the one who executed, and was liable upon the bond and mortgage. An additional $1,000 was obtained by Mrs. Jurich by borrowing that amount from Antonio Marolda. There is nothing to show that Graff was liable for that debt at all. I assume from the testimony that Mrs. Jurich was the only one liable to Marolda, although there is nothing to show, on the other hand, that Graff was not responsible. However, that is not material, because three or four months later that $1,000 was put into the shape of the original proposition by the cancellation of the two $1,500 mortgages and the creation of two $2,000 mortgages, one upon each of the respective properties, and Graff was the obligor on No. 705. Marolda was paid off out of the additional $1,000 thus raised. That put the proposition back as originally planned, with the result that the son paid for No. 705 by his bond and mortgage for $2,000 and the one-half of the $3,000 cash, which was derived from the sale of 711 in which he was a half owner.

"Now, the testimony of Graff and his mother is, as I have said, to the general effect that prior to the purchase of this property at 705 and 707 Chestnut avenue it had been agreed between them—and the husband, Mr. Jurich, was in some sense a party to that agreement—that because of trouble which had occurred between Mr. and Mrs. Jurich, due to the fact that the son had an interest in this property and was not furnishing as much money to the household as the husband, it was agreed that he was to pay to his mother the purchase price of No. 705 and also for the improvements that were put on it and that were to be put on, and that this payment was to be made at the rate of $25 a month. I am satisfied that that is not so. I am satisfied both from what I have already said and also from further contradictions and improbabilities in the testimony of Graff and his mother.

There was nothing in what was testified to or in the manner of testifying of Graff and his mother to impress me of the credibility of the story as it was told in that behalf. It is not necessary for me to go into detail as to all of the items in that testimony. Graff particularly impressed me in the first part of his testimony as testifying to a story which had been agreed upon and memorized. 'Later on in his testimony I recall, for instance, he said that this arrangement had been made, that this property at No. 705 should be paid for by him in this way, at that time when No. 711 was sold. He had a few minutes before that expressly stated that at the time 711 Chestnut avenue was sold there was no idea on the part of any of them that there was to be a purchase of 705 Chestnut avenue, that that was not decided until two or three months afterwards. And there were a number of other instances of conflict of testimony. I recall, for instance, in another part of his testimony, he said that this deed back to his mother had been agreed upon in the middle of the summer. The impression sought to be given was that the arrangement had been made with the attorneys, that the instructions had been given to have the deed executed at that time, and something had delayed the matter, so that it actually was executed on September 2d. But he afterwards stated, when pinned down, that he never had seen a lawyer or anybody else about the draft of the deed until the day of its actual drafting and execution. He said he had tried to see a lawyer and had been to the office several times, but had not been able to see him.

"There was, however, a considerable amount of testimony of, I think, four witnesses at least, which was a thing that gave me some pause, which seemed to corroborate the story as to this agreement for the payment of money. These witnesses said that they had heard conversations in the middle of the summer indicating that there had been an agreement by Graff to pay, and that Graff had failed to keep that agreement, and that therefore the property was to be conveyed back to the mother. Now, when that testimony is analyzed it will be noticed that the only actual facts testified to are

these: That there was a conversation at which Mr. Jurich complained that Graff was not making the payments, and that he ought, therefore, to convey the property to his mother, and that the mother agreed; that Graff said nothing; nor was there anything said as to the amount of the payments or as to what the payments were to have been made for. There is a question in my mind as to why those particular conversations should have been overheard by these persons; but taking it at its face value, there is no evidence from that testimony of such an agreement as was testified to by the defendant Graff and his mother, namely, that the payments were to be $25 a month and that they were for the consideration price of the property, $1,500.

"There is another feature that is not without significance, and that is that the allegation of the answer is simply that the mother's interest in the property was under this agreement, which is recited as an agreement to repay $1,500 consideration. The answer does not say that it was an agreement to pay for moneys spent for improvements at that time. The answer says that the moneys were spent for the conveyance. Counsel has asked leave to amend to conform to the proofs. That does not change the fact that the defence originally set up by these defendants in the answer is different from the story now told by them. The proofs show also that Graff himself ordered these improvements made, and that he himself paid for some of them, and that he obligated himself to pay for others.

"The situation is, of course, complicated by the fact that all three of them lived in the house, and by the fact that, as I say, Graff paid $10 a week board. But it is also significant that in spite of the fact of Graff's alleged indebtedness as testified by all three of them, and the fact that the mother advanced him further moneys in and about the defence of the suit at law (amounting to some $600 or $700, I think), there has never been the slightest effort on his part to pay any of that back, down to the present time.

"I am satisfied, therefore, that there was no agreement on the part of Graff at the time of the purchase of this prop-

erty to pay his mother $1,500 for the property, or any other sum. He had paid legal consideration for that property, and the property was his, and that leaves, therefore, the conveyance to the mother without consideration, as far as the testimony in this case goes.

"The claim is made that the conveyance should be considered as repayment, pursuant to the contract, of the moneys loaned by the mother or advanced by her for improvements. As I have said, that was not the original claim. It may have been that the son agreed to pay to the mother payments of $25 a month, or some other sum; that may have been in respect to the $1,000 that was borrowed from Marolda or moneys she had loaned him for the improvements, but I am satisfied that there was no contract and no such situation as has been claimed, which would put the equitable title to that property, either by way of contract or vendor's lien, in the mother at the time of purchase.

"Perhaps the strongest bit of testimony is that of Mr. Satterthwaite, a member of the bar, of unimpeachable standing and veracity. He testified that immediately prior to the purchase of these two properties Mrs. Jurich and Mr. Marolda came to his office, and that Mrs. Jurich wanted to know if she could have the deed for that part of the property which was to be hers made to someone as trustee for her, and if that would keep her husband from having anything to do with the property and do away with the necessity of the husband joining in the deed if and when she wanted to sell it. Now, that, of course, is convincing and conclusive evidence, to my mind, that there was no idea on her part of acquiescing in what they say was the demand of the husband at that time as to the properties. The husband had wanted to have the properties put in the names of himself and his wife, jointly, or in his wife's name alone; and she was taking steps to see that he did not have any interest in the property. Mr. Satterthwaite's testimony thus discredits the entire story of the defendants as to the agreement of the son to pay, which they said was entered into because of the husband's desires and insistments.

"As to the moneys paid for the improvements (the claim is that these amounted to between $1,000 and $1,200). I am satisfied that the proof has been insufficient to show the creation of an equitable lien upon the property, for the reasons I have already indicated. Furthermore, even if such a condition existed as would warrant the protection of Mrs. Jurich by a lien upon the property to the extent of these moneys so paid, I think that has been forfeited by the participation which she had in this conveyance made for the purpose (as necessarily follows from what I have said), of hindering and delaying the judgment creditor in the collection of that judgment debt. Her story is that it was taken as satisfaction for a $1,500 purchase price debt. That I find not to be the fact, and it follows, therefore, that she knew she was getting property worth $1,500 to $2,000 for a claim which, at most, could not exceed $1,200. She knew—she could not help knowing—the situation as to the liability to Miss Coleman. This is certain not only from the evidence as to the nature of the circumstances that existed between herself and her son, but is further corroborated by the testimony of several witnesses as to the remarks made by her at or shortly after the time of conveyance.

"Upon the whole case, therefore, I am compelled to find that the conveyance should be set aside and the prayer of the bill granted.

"Costs, including an allowance of $300 for counsel fee, will be awarded against the defendants Graff and Mrs. Jurich,

*Mr. Maxwell A. Kraemer,* for the respondent.

*Mr. Harry Heher,* for the appellants.

PER CURIAM.

The decree order appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Buchanan.

'*For affirmance* — THE CHIEF-JUSTICE, SWAYZE, TREN-CHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, KATZENBACH, WHITE, HEPPENHEIMER, GARDNER, ACKERSON, VAN BUSKIRK—14.

*For reversal*—None.